DOUGLAS TIFFANY & another[1] *vs.* STURBRIDGE CAMPING
CLUB, INC., & others.[2]

No. 90-P-105.

Essex. October 18, 1991. - February 27, 1992.

Present: KASS, GILLERMAN, & LAURENCE, JJ.

*Contract*, Performance and breach. *Real Estate Time-Share Act. Condominiums*, Time-share ownership. *Real Property*, Time-share ownership. *Statute*, Retroactive effect. *Practice, Civil*, Findings by judge, Summary judgment.

Although a judge's failure to make express findings in support of his determination under Mass.R.Civ.P. 54(b), to direct the entry of a partial final judgment for the defendants in a civil action, would have warranted dismissal of the plaintiffs' appeal, this court concluded that, in the circumstances, no economy would be achieved by dismissal. [178-179]

The interest obtained by purchasers of a membership in a recreational camping club, which granted members the right, upon payment of monthly dues and management fees, to the seasonal use of camping sites within a certain campground for twenty-five years, was a "time-share license" for purposes of G. L. c. 183B, the Real Estate Time-Share Act. [179-180]

In an action by purchasers of a membership in a recreational camping club against the operators of the club, asserting various claims under G. L. c. 183B, the Real Estate Time-Share Act, the defendants were entitled to summary judgment on claims based on events and circumstances occurring before the effective date of the act, as provided in St. 1987, c. 760, § 3 [180-184]; however, they were not entitled to summary judgment on the plaintiffs' claim under § 6 of the act, alleging that actions by the defendants subsequent to the act's effective date violated their obligation of good faith [184-185].

---

[1]June Tiffany.

[2]Outdoor Recreation, Inc., and Quinebaug Cove Campsite, Inc. The last named defendant is the style in which Outdoor Recreation, Inc., does business. The defendant Sturbridge Camping Club, Inc., manages the membership program at the Quinebaug Cove campsite. The defendant Outdoor Recreation, Inc., owns the campsite property. The separately incorporated but apparently related corporate defendants shall be designated herein collectively the "defendants."

CIVIL ACTION commenced in the Superior Court Department on October 11, 1988.

The case was heard by *John T. Ronan*, J., on a motion for summary judgment.

*Burton A. Nadler* for the plaintiffs.

*Mark B. Johnson* for the defendants.

LAURENCE, J. As Sherlock Holmes observed a century ago, one does not necessarily escape life's problems by returning to nature.[3] So discovered the plaintiffs, Douglas and June Tiffany, avid recreational campers. Their innocent attempt to secure a permanent, secluded campsite sanctuary, seemingly offered by the defendants, resulted in frustration and litigation of the sort usually associated with harried urban existence. The Tiffanys' appeal from a partial summary judgment against them brings to us issues of first impression regarding the applicability and retroactivity of G. L. c. 183B, the Real Estate Time-Share Act. On the record before us, we are able to provide only partial resolution of these issues and limited relief to the Tiffanys.

On May 3, 1987, the Tiffanys paid the defendants a $5,495 "initiation fee" to become "Deluxe Charter" members of the Sturbridge Camping Club in East Brimfield, with the right, upon payment of monthly dues and management fees, to seasonal use of the Sturbridge campground for twenty-five years. The Tiffanys thought they were receiving, among other club benefits, the right to use one specific campsite, No. 508B, whose prospect had particularly attracted them, every year during the May to October camping season. Douglas Tiffany's summary judgment affidavit stated that he had expressly told the defendants' sales agent that the Tiffanys were joining the club only because they wanted that one site each year and that the agent had orally promised they would have it.

---

[3]"It is my belief . . . founded upon my experience, that the lowest and vilest alleys in London do not present a more dreadful record of sin than does the smiling and beautiful countryside." Doyle, "The Adventure of the Copper Beeches," in The Complete Sherlock Holmes 323 (Morley ed. 1930).

At the time they joined, the Tiffanys executed an "Extended Stay Permit" that granted them the "right to continuously occupy site no. 508B . . . for the period May 1st to Oct. 7."[4] On the same day, they also signed a "Membership Application," a "Fact Sheet," and the "Club Rules." The Tiffany affidavit stated that they did not read, understand, or receive explanations of any of these documents. It described the defendants' documents as "obscure 'form' documents with small print" which the Tiffanys mechanically signed when put in front of them. They assert, however, that they did not believe or intend that by so signing they would lose the right to use site 508B annually as orally promised them by the defendants' agent.[5]

The defendants' membership documents executed by the Tiffanys expressly provided that membership did not involve the purchase of any interest in real estate; that prospective

---

[4]The Extended Stay Permit did not specify a particular year. The Tiffanys several times mention in their brief the lack of a year limitation on the permit, intimating that this supported their conviction that they had reserved the specific site for the duration of their membership. However, they never explicitly allege or argue that the permit contractually bound the defendant to grant them seasonal use of the site every year for twenty-five years, and they acknowledge that the defendants' agents told them that they would receive a separate permit each year for each camping season. They based their breach of contract claim not on any alleged violation of the permit provision, but rather on the defendants' subsequent changes in "the policies and rules of the campground." The Tiffanys' tactical conduct in response to these changes, see *infra*, belies any argument that they were relying on the permit as automatically insuring their reservation to site 508B every camping season for twenty-five years. ("There is no surer way to find out what the parties meant, than to see what they have done." *Pittsfield & N. Adams R.R.* v. *Boston & Albany R.R.*, 260 Mass. 390, 398 [1927]). The provisions and limitations of the permit itself make it clear that it spoke only to the 1987 camping season. In addition, the permit expressly stated that it was subject to all club rules and regulations, which authorized the club's board of directors to change its reservation and use policies and the duration of each year's camping season at any time.

[5]Although the Tiffanys contend that their lack of understanding is an essential factual element of at least one of their claims, which accordingly should not have been dismissed, their plea is unavailing. In the absence of fraud, not here alleged, a person who signs a written agreement is bound by its terms whether he reads and understands them or not. See, e.g., *Spritz* v. *Lishner*, 355 Mass. 162, 164 (1969).

campers, members and nonmembers alike, had to make their reservations anew each year, on a first-come, first-served basis; and that the defendants could change the camp rules at any time in the interest of the health, safety, and general welfare of members and guests. The documents also explicitly stated that membership purchasers could place no reliance upon any representations or promises not made in writing.

After camping at site 508B from May to October, 1987, without incident, the Tiffanys learned that the defendants would not accept reservations for the 1988 camping season until January, 1988. In early January, a letter from the defendants informed the Tiffanys that they had been assigned to a site other than 508B for the 1988 season. Upon investigation, the Tiffanys discovered the existence of certain policy changes made since October, 1987, with respect to site reservations. The defendants had reclassified some of the sites, including 508B, from extended stay sites to transient sites, because of poor trailer access, lack of sewer and cable connections, and the need to improve safety by reducing traffic. In addition, a new reservation policy, implemented some time in January, 1988, provided that members could occupy transient sites continuously for only fourteen-day intervals during the season.

In response to the new policy, the Tiffanys, in January or February, 1988, reached an informal agreement with another member couple facing the same situation with respect to a site directly across the road from 508B. Their solution was to make formal reservations alternating between the two sites, while each couple would in fact remain in place on its desired site for the entire season. The Tiffanys proceeded to send reservations for alternate two-week periods to the defendants in February, 1988. Following the last such reservation, the defendants' director wrote Douglas Tiffany to "reiterate the reservations policy, only one reservation each 48 hours at a time for one stay of two weeks maximum on one site. If you need future clarification please contact me at

your earliest convenience." The Tiffanys did not respond to that invitation.

While the parties were thus maneuvering in early 1988, the General Court enacted the Real Estate Time-Share Act, St. 1987, c. 760, codified as G. L. c. 183B (the Act), on January 14, 1988. Without an emergency preamble (and with no documented legislative history), the Act became effective ninety days thereafter, on April 13, 1988. Various corrective amendments pertinent to this proceeding became effective on May 17, 1988, by virtue of St. 1988, c. 36. By that time, the Tiffanys were enjoying the fruits of their phantom alternating reservation plan, which appears to have come to the defendants' attention by June, 1988.

The defendants' campground manager informed the Tiffanys in early June, 1988, that they had to remove their camping trailer physically from site 508B to their actual reservation site across the road, in compliance with the campground rules communicated to the Tiffanys in January and February, 1988. Upon the Tiffanys' refusal to unhook their trailer, the manager sent them a letter suspending their membership and privileges for violation of the reservations policy, particularly by staying beyond the fourteen-day rule period. Shortly thereafter, the manager had the Tiffanys' trailer towed off the site, damaging it in the process. In July, 1988, the defendants' operations director notified them that their membership privileges had been suspended for sixty days and that they had a right of appeal to the defendants' board of directors within thirty days.

The Tiffanys did not appeal internally but instead brought suit in October, 1988. Six counts of their complaint alleged that the defendants' actions had constituted breach of contract, various torts, and unfair and deceptive practices under G. L. c. 93A. In addition, the complaint contained four counts charging that the defendants had violated eight sections of the Act. The defendants denied all allegations and branded the complaint a frivolous action in a counterclaim pursuant to G. L. c. 231, § 6(*f*). After discovery was complete, in July, 1989, the defendants moved for summary

judgment on all counts of the complaint. On October 11, 1989, after hearing, a Superior Court judge, without opinion,[6] allowed the motion as to the four counts (II, IV, V, and VI) grounded on the Act. The Tiffanys moved for immediate entry of separate judgment on those counts, pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974). The judge allowed the motion in December, 1989.

This proceeding once again presents us with a certification under rule 54(b) that does not appear to have been appropriate in the circumstances and that could justify dismissal of this appeal. Although the judgment stated that it was "upon an express determination that there is no just reason for delay," the judge failed to make any express findings setting forth his reasons justifying that incantation of the prescribed formula. We have over the past decade frequently declared the need for such findings when the judge's reasons are not, as they are not here, clear on the record. See *J.B.L. Constr. Co.* v. *Lincoln Homes Corp.*, 9 Mass. App. Ct. 250, 252-253 (1980); *Paris* v. *Snappy Car Rental, Inc.*, 18 Mass. App. Ct. 968, 969 (1984); *High-Tech Sales, Inc.* v. *Olektron Corp.*, 31 Mass. App. Ct. 912, 913-914 (1991). Contrast *Dattoli* v. *Hale Hosp.*, 400 Mass. 175, 176 (1987) (separate judgment for two of four defendants warranted because there were no other claims against them and no substantial overlap between the issues involving them and those remaining for trial).

Here, where the same essential facts underlie all of the Tiffanys' claims and no defendants are being dismissed, "[w]e discern no economy achieved or hardship avoided by the judge's certification." *High-Tech Sales, Inc.* v. *Olektron*

---

[6]The Tiffanys devote an entire section of their brief to arguing that the judge abused his discretion in allowing the defendants' summary judgment motion without an opinion. Their theory appears to be that an explanation of the judge's rationale was necessary because of the novelty of the legal questions presented by G. L. c. 183B. They cite no authority for this contention, however. While appellate courts always welcome reasoned statements explaining lower courts' rulings, we cannot ignore the language of Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974), which states that "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56. . . ."

*Corp.*, 31 Mass. App. Ct. at 913. In such a case, when our resolution of the issues being appealed, however fascinating or important they may be, "will not simplify, shorten or expedite the trial of any of the other claims still pending in the Superior Court," *J.B.L. Constr. Co. v. Lincoln Homes Corp.*, 9 Mass. App. Ct. at 252, a detailed explanation of the undisclosed reasons for certification is especially desirable. In addition, "we are unable to determine whether the special care called for by the presence of a counterclaim has been exercised." *High-Tech Sales, Inc. v. Olektron Corp., supra* at 913.

Despite these admonitions, we do not dismiss the Tiffanys' appeal from the separate judgment, "since the issue was not argued to us, and since, in the circumstances [after full briefing and oral argument], no economy will be achieved by a dismissal. . . ." *Id.* at 914. The question before us involves the Act's applicability to the defendants generally, as well as the applicability of the specific sections of the Act relied on by the Tiffanys.

The defendants first argue that the relevant definitions of "time-shares" in the Act do not cover the kind of campground activity they conducted, which they analogize to operation of a traditional country club. The Act, however, applies to any "time-share," defined as either a "time-share estate"[7] or a "time-share license."[8] We need not decide whether members' rights at the Sturbridge campground amount to time-share estates[9] because the Tiffanys' interest

---

[7]General Laws c. 183B, § 2, defines a time-share estate as "a right to the occupancy of a unit or any of several units during five or more separated time periods over a period of at least five years, including extension or renewal options, coupled with a freehold estate or an estate for years in a time-share property or a specified portion thereof."

[8]General Laws c. 183B, § 2, defines a time-share license as "a right to the occupancy of a unit or any of several units during five or more separated time periods not coupled with a freehold estate or an estate for years."

[9]The defendants' "Fact Sheet" explicitly disclaimed that members were receiving any interest in real estate. See, however, *Cal-Am Corp. v. Department of Real Estate*, 104 Cal. App. 3d 453 (1980), which held that one who buys exclusive occupancy, although for only a portion of the year,

fits the definition of a time-share license. The defendants argue that the Tiffanys did not have such a license because they received no right to occupy a "unit," defined in c. 183B, § 2, as "real property, or a portion thereof, designated for separate use." This argument collides with the plain meaning of the statutory language[10] as well as the reality of the defendants' operations.[11]

A more difficult question is the applicability of the Act not merely to campground operations of the sort in which the defendants engaged but to the circumstances of this particular case. All of the documents reflecting and governing the Tiffanys' rights vis-à-vis the defendants well predated the effectiveness of the Act (April 13, 1988). The specific events precipitating this litigation, however, occurred subsequent to the Act's effective date. The Tiffanys assert that the Act expressly provided for retroactive application of the eight sections upon which they rely.[12] The enacting legislation, St.

___

acquires an interest in real estate even where the club in question retained the right to determine which unit members would occupy during any given stay. See generally Annot., Regulation of Time-Share or Interval Ownership Interests in Real Estate, 6 A.L.R. 4th 1288 (1981).

[10]Giving the statutory words their ordinary dictionary meaning, see G. L. c. 4, § 6; *Burke* v. *Chief of Police of Newton*, 374 Mass. 450, 452 (1978), "designate" means to indicate, identify, label, or call by a distinctive title, and "separate" means set or kept apart, detached, or distinct. Webster's Third New Intl. Dictionary 612, 2069 (1971). The Legislature's broad definition of unit easily encompasses camp sites as well as apartments or other identifiable bits of real estate set aside for an individual's exclusive use or possession for a particular duration.

[11]The defendants' campground was organized into separate, specifically numbered campsites with identifiable boundaries that were reservable by designation in advance. The documents executed by the Tiffanys defined "campsite" as "A physical site consisting of sufficient space for one recreational vehicle or tent, and parking space for two other vehicles, and service outlets for electricity and water . . ." and described membership as the right "to use of a campsite." Seasonal campers like the Tiffanys received specifically designated campsites for their separate and exclusive extended stay use.

[12]Count II charged rule changes without the written notice required by § 32 of the Act. Count IV charged failure to provide a letter of public offering and a notice of exchange programs, as required by §§ 38, 41, and 53. Count V alleged breach of contract and of the obligation to perform in good faith, in violation of §§ 5 and 6. Count VI charged efforts to evade

1987, c. 760, § 3, states that the provisions of the Act "shall apply to all time-shares created . . . on or after the effective date of this act [April 13, 1988]," but also allowed for limited retroactive application of certain sections of the statute. The Legislature provided that thirty-four sections of the Act are to apply to "all time-shares created in units in the commonwealth before the effective date of this act," including, for our purposes, sections five, six, thirty-two, thirty-eight, forty-nine, and fifty-three of the act,[13] "to the extent necessary to construe any of said sections . . . but only with respect to events and circumstances occurring on or after the effective date. The provisions of said section[14] shall not affect the validity of, or rights or obligations created before the effective date of this act by a time-share instrument, document transferring an estate or interest in real property, or contract." The Tiffanys fail to essay any interpretation of § 3's unusual retroactivity provisions.[15] Their unqualified assertion, that all the sections of the Act on which they ground their dismissed counts are fully retroactive and applicable to their claims, is without merit. The defendants have acknowledged that the Act directs some degree of retroactive application.[16] They argue, however, that the language omitted by

the requirements of the Act in violation of §§ 4 and 49. All of these counts characterized these failures of compliance with the Act as also being unfair and deceptive practices under G. L. c. 93A.

[13]Statutes 1987, c. 760, § 3, did not originally include §§ 38, 41, and 53, which were added to the retroactivity provisions by St. 1988, c. 36, effective May 17, 1988.

[14]The word "section" has no logical antecedent in § 3 and is apparently a typographical error. We are convinced that the Legislature intended to use the plural "sections," since only in that fashion can this sentence be read in harmony with the entirety of § 3.

[15]Indeed, the Tiffanys' brief does not even quote the retroactivity-qualifying language of § 3 but, rather, using strategic ellipses, omits it entirely. They append the entire thirty-four page, fifty-five section statute to their brief, rather than just the relevant sections. Without deciding or discussing the matter further, we point out that knowing conduct of this sort comes perilously close to violating the mandates of DR 1-102(4) and DR 7-102(A)(2), (5), 382 Mass. 770, 785 (1981), as well as Mass.R.A.P. 16(e) (last sentence) and 16(f), 365 Mass. 862 (1974).

[16]The defendants do so only grudgingly, however. They first maintain that the only decision which has discussed the Act, McCabe v. Assessors

the Tiffanys demonstrates that the retroactivity provision has only a limited purpose: that of facilitating the construction of the thirty-six specified sections of the detailed statute which require the use of information and reference to facts and circumstances predating the Act in order subsequently to review their impact. The defendants proffer no authority to support this dubious position, nor any meaningful illustrations of how such an interpretation of the retroactivity clause would operate.

---

*of Provincetown*, 402 Mass. 728, 729-730 n.3 (1988), holds that the provisions of the Act are not retroactive. Otherwise, the Supreme Judicial Court would have applied § 3(*a*), (*b*) to the issues in that case. Their argument fails, because the issues in *McCabe* did not implicate the Act. The case involved an assessment by the assessors against two taxpayers as individuals, despite the fact that the taxpayers had converted the property subject to tax to a condominium facility under G. L. c. 183A, all of whose units were devoted to time-sharing use, and of which they were the trustees under the condominium trust. The taxpayers argued that record ownership rested with the individual time-share unit owners. At an early stage of the controversy, a trial judge ruled that, under G. L. c. 183A, time-share ownership was not an interest in real property but nonetheless held that the condominium and the individuals as trustees, not as individuals, were the record owners for assessment purposes. That issue was never raised or appealed. The Supreme Judicial Court noted in passing that G. L. c. 183B, § 3(*a*), (*b*), had created a real estate interest in time-share units and provided for tax assessments to the individual time-share owners but explicitly stated that those provisions were not involved in the case.

The defendants secondarily suggest that giving retroactive application to any section of the Act would impair the obligations of the parties' contracts, in violation of the United States Constitution, art. 1, § 10, cl. 1. They cite no relevant authority for this proposition, which is unsupported in our law. A statute is not unconstitutional merely because it affects the performance of contracts entered into prior to its enactment. A legislative impairment of contract will be upheld if reasonable and necessary to serve an important public purpose, and every rational presumption is indulged in favor of the statute's validity. *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins.*, 397 Mass. 416, 423 (1986). See *Nantucket Conservation Foundation, Inc.* v. *Russell Mgmt. Inc.*, 380 Mass. 212, 215-216 (1980); *Boston* v. *Keene Corp.*, 406 Mass. 301, 311-312 (1989). In this deferential light, particularly in the absence of reasoned argument by the defendants, we have no difficulty in discerning a rational public purpose in the enactment of G. L. c. 183B, if only to protect purchasers of time-share interests. We consequently accept for purposes of this case the Act's presumptive constitutionality, without having to decide the issue.

We need not, however, resolve the difficult issue of the precise meaning and scope of the Act's retroactivity provision in order to decide this appeal. The plain language of St. 1987, c. 760, § 3, dictates that the specified sections shall apply to preexisting time-shares "only with respect to events and circumstances occurring on or after the [statute's] effective date." The contract documents executed by the Tiffanys, the rules changes effected by the defendants, and the reservations made by the Tiffanys all antedated the effectiveness of the Act. The only events and circumstances that occurred after that date were the defendants' actions in June and July, 1988, ordering the Tiffanys to move their trailer from site 508B, towing and damaging their trailer upon their refusal, and suspending their club membership for noncompliance with the rules. Only those events and circumstances can potentially give rise to liability on the part of the defendants under the Act.

Accordingly, the judge properly allowed summary judgment against counts II, IV, and VI of the Tiffanys' complaint. Count II, alleging the defendants' violation of c. 183B, § 32, by changing rules without proper notice, failed because the defendants promulgated the new reservation and length-of-stay rules at least two months prior to the effective date of the statute. No relevant rule changes occurred after the effective date. Additionally, by its terms the obligations under § 32 apply only to time-share "projects" consisting of at least forty percent time-shares other than time-share licenses. The Tiffanys failed to demonstrate that this mix existed in the defendants' campground.

Count IV alleged that the defendants violated §§ 38, 41, and 53 by failing to provide the Tiffanys with a letter of public offering and a notice regarding the time-share exchange program. The obligations imposed by these sections, however, are explicitly pegged to the date of the signing of the original time-share contract, which occurred here eleven months prior to the Act's effectiveness. The fact that § 38(14) and § 41 provide the time-share purchaser with a right of cancellation upon his failure to receive the offering statement within a

few days of executing his contract demonstrates the nonapplicability of the public offering requirements to units or interests sold prior to the effective date of the Act. Retroactivity of those provisions would be manifestly inconsistent with that portion of St. 1987, c. 760, § 3, first par., which states that the specified sections of the Act "shall not affect the validity of, or rights or obligations created before the effective date of this act by . . . contract."

Count VI alleged that the defendants' efforts to "evade" the Act's limitations and prohibitions constituted a violation of § 4, which states that the provisions of and rights conferred by the Act cannot be varied or waived by agreement. Section 4 is not, however, one of the sections given even limited retroactive effect by St. 1987, c. 760, § 3, and so cannot serve as a basis for any claim for relief by the Tiffanys. The assertion in count VI that the defendants' conduct is a violation of § 49 of the Act is based solely upon the defendants' alleged violation of § 4. That makes the Tiffanys' reference to § 49 in count VI superfluous as well as ineffective, since § 49 deems any failure to comply with the provisions of the Act, where applicable, an unfair or deceptive practice under G. L. c. 93A.

Finally, the Tiffanys' reliance on § 5 of the Act in count V is misplaced. Section 5 applies only when the time-share contract "was unconscionable at the time [it] was made." The Tiffanys neither alleged in their pleading nor established by their affidavit that their contract with the defendants, or any clause thereof, was unconscionable when made. Affording them the remedy of nonenforcement pursuant to § 5 would also be contrary to that portion of St. 1987, c. 760, § 3, first par., which prevents any of the retroactive sections from affecting the contractual rights or obligations created before the Act's effective date.

The judge should not, however, have dismissed count V of the Tiffanys' complaint insofar as it charged a violation of § 6 of the Act. That section states that "[e]very contract or duty governed by this chapter imposes an obligation of good faith in its performance or enforcement." Several of the de-

fendants' actions which the Tiffanys claim are violations of that good faith obligation undeniably occurred subsequent to the Act's effective date. These included the defendants' enforcement of their reservation and site occupancy policy by towing and damaging the Tiffanys' trailer; their refusal to honor the Tiffanys' alternating reservations that may literally have complied with the camp rules; and their suspension of the Tiffanys' membership privileges without a prior hearing. The parties vigorously disputed the circumstances and motivations surrounding those actions, which were thus not appropriate candidates for summary judgment. Subjecting the defendants to the good faith performance requirement of § 6 does not adversely affect their rights or obligations, since the duty of good faith and fair dealing is implicit in the performance of every contract, even if not stated. *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471-472 (1991).

Accordingly, we reverse the judgment with respect to so much of count V as asserts a violation of G. L. c. 183B, § 6. In all other respects, we find no error and affirm the judgment. We deny the defendants' prayer for appellate attorneys' fees, as it is unsupported by argument and unjustified in the circumstances, but allow their costs in defending against the appeal.

*So ordered.*